IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| DAVID A. PENCE | : |
|  | : |
| v. | : Civil Action No. DKC 2004-3396 |
|  | : |
| MARC ZIFCAK, *et al.* | : |
|  | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution is the motion of Defendants Montgomery County Police Detective Marc Zifcak; Montgomery County Department of Health and Human Services psychologist Maria E. Zammichieli; Montgomery County Police Lieutenant Robert Bolesta; and Montgomery County Police Department Officers John Does ("Defendants") for summary judgment pursuant to Fed.R.Civ.P. 56.[1] (Paper 18). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motion for summary judgment will be granted.

I. **Factual Background**

The facts set forth below are uncontroverted, except where otherwise noted. On October 21, 2001, Plaintiff, David A. Pence, called the police to report that four African-Americans had broken

---

[1] Plaintiff has not amended his complaint to identify the John Doe police officers, despite ample opportunity to do so and discovery indicating the identity of relevant police officers. The statute of limitations has passed. Thus, all claims against unidentified Montgomery County Police Department Officers John Does will be dismissed.

into his house. (Paper 18, Ex. 1, Pence Dep., at 63). Officers Robyn Chuckerel (formerly Harris) and Kevin Parker responded to Plaintiff's call. (Paper 18, Ex. 2, Chuckerel Dep., at 4). On October 21, Officer Chuckerel prepared a report of the incident ("initial report"). The investigation into the break-in of Plaintiff's home was subsequently assigned to Defendant Officer Marc Zifcak.

During the course of his investigation into the break-in, Defendant Zifcak met with Plaintiff at his home on October 23. Defendant Zifcak noticed numerous guns stashed around the house, including loaded rifles in the bedroom and living room, a loaded pistol and loaded revolver underneath the pillows of the couch, and a shotgun in the living room. (Paper 18, Ex. 3, Zifcak Dep., at 18-20). He also noticed the house was "in somewhat disarray. There were paths here and there, paths to the couch, paths to the back of the house, to the kitchen." (*Id*. at 18).

When Defendant Zifcak asked Plaintiff why he thought anyone would want to break in to his house, Plaintiff mentioned his cardiologist, Dr. Patricia Davidson, saying she "did not like heavy white male patients." (*Id*. at 13). Plaintiff gave Defendant Zifcak a note with Dr. Davidson's contact information, and wrote underneath "Animus (extreme against white people) - especially her two black assistants (both female)." (Paper 18, Ex. 4). He also supplied contact information for two other doctors, Dr. David

Waldman and Dr. Lewis Winkler, with a note by their names saying "both are Zionists." (*Id.*). Plaintiff admits that he saw Dr. Winkler regularly from 1988 until 2002 for psychiatric treatment, (paper 27, Ex. 18, Second Pence Dep., at 31), but states that he has never been treated by Dr. Waldman, (paper 24, Ex. 1, Pence Aff., ¶ H).

During Defendant Zifcak's meeting with Plaintiff on October 23, Plaintiff started including details about the break-in which were not in the initial report. "[T]he actions of the burglars seemed much more violent than it was expressed in the [initial] report." (Paper 18, Ex. 3, Zifcak Dep., at 12). Plaintiff showed Defendant Zifcak scratches on the back of his hand that he claimed occurred during the break-in. (Paper 18, Ex. 3, Zifcak Dep., at 13; paper 24, Ex. 1, Pence Aff., at ¶ G). The injuries on Plaintiff's hand were not in the initial report - the spaces on the form indicating "nature" and "location" of injuries were left blank. (Paper 18, Ex. 3, Zifcak Dep., at 12, 26-27). Defendant Zifcak testified that it is unusual not to include information about an injury when a victim reports an assault. (*Id.* at 26). Plaintiff sought treatment for his injuries at Holy Cross Hospital in Silver Spring, Maryland on October 22. (Paper 24, Ex. 5, Pence Dep., at 96).

Defendant Zifcak testified that he was concerned for Plaintiff's welfare for a number of reasons:

> From initial contact with Mr. Pence, his
> comments about a home invasion burglary/
> robbery of his home where nothing is taken[,]
> that is initially reported with no injuries .
> . . indicated by him, then the injuries appear
> when he calls me.  The condition of his house,
> the firearms loaded around the house.
> Statements on the note he hands me about his
> doctor.  I'm a little concerned about Mr.
> Pence's welfare, not as, and he's not under a
> criminal investigation. . . . Just, here's a
> person who might need to speak to somebody. .
> . . [H]e seems a little paranoid . . ., it's
> almost conspiratorial.

(Paper 18, Ex. 3, Zifcak Dep., at 22-23).

Upon returning to the office, Defendant Zifcak made a series of phone calls.  Defendant Zifcak spoke with the initial responding officer, Officer Chuckerel, to inquire about the injuries and she "said that [Plaintiff] didn't have any injuries on him when she spoke to him and he didn't indicate, didn't claim to have any injuries[.]"  (*Id.* at 27).  Plaintiff disputes this, testifying that he "initially and consistently" reported the injuries on his hand to the police.  (Paper 24, Ex. 1, Pence Aff., ¶ G).  Defendant Zifcak also spoke with Dr. Waldman, who advised him that Plaintiff was under treatment for certain conditions, including psychosis, and was prescribed several medications to treat those conditions.  (Paper 18, Ex. 3, Zifcak Dep., at 28).

That afternoon, Defendant Zifcak called the Crisis Center, a division of the Montgomery County Health and Human Services Department, to request that a mental health professional speak with Plaintiff.  (*Id.* at 28).  Per standard procedure, the Crisis Center

4

sent two mental health professionals, accompanied by the police, to meet with Plaintiff in his home to conduct a mental status exam. (Paper 18, Ex. 6, Zammichieli Dep., at 5-6).  Defendants offer evidence that Defendant Dr. Maria Zammichieli and Larry Stewart conducted the interview.  (*Id*. at 6).  Plaintiff agrees that a number of police officers visited him that day, October 23, but denies having a discussion with Defendant Zammichieli.  (Paper 24, Ex. 5, Pence Dep., at 97; *id.*, Ex. 1, Pence Aff., ¶ I).[2]

Although Plaintiff has repeatedly and emphatically denied that he was interviewed by Defendant Zammichieli, Defendant Zammichieli testified that the following occurred as she and Mr. Stewart talked with Plaintiff for approximately 30 minutes on October 23. (Paper 18, Ex. 6, Zammichieli Dep., at 16).  During the course of the interview they asked Plaintiff standard questions: whether he heard voices, if he was suicidal, whether he was currently in treatment, what medications, if any, he took, and whether he had ever been hospitalized for psychiatric reasons.  (*Id*. at 12-13).  Plaintiff responded that he felt that African-Americans were after him and that Jewish people were responsible for blowing up the base of the World Trade Center.  (*Id*. at 13).  He also purportedly told Defendant Zammichieli that "if any African-Americans came on his property that there would be bloodshed tonight and that he would do

---

[2] Plaintiff never specifically denied that Defendant Zammichieli was present during the events of October 23.

what he needed to do.  And that he would get incarcerated." (*Id.* at 34).  Defendant Zammichieli also testified that Plaintiff informed her that he had been prescribed four psychiatric medications, Trilafon (anti-psychotic used to treat schizophrenia), BuSpar (anti-anxiety), Prozac (anti-depressant), and Klonopin (anti-anxiety).  She testified that he told her that he "had not taken the Trilafon in some time." (*Id.* at 13).

After finishing the interview, Defendant Zammichieli, Mr. Stewart, and two police officers entered the house.  (*Id.* at 18).  Plaintiff also disputes the assertion that Defendant Zammichieli entered his home, "I am not aware of any time or circumstance, at or under which, Ms. Zammichiele [sic] was ever inside my home.  If she ever was inside my residence, I was not there." (Paper 24, Ex. 1, Pence Aff., ¶ K).  Defendant Zammichieli testified that the living conditions were "deplorable;" there were approximately ten plastic buckets of urine in the bathroom that "appeared [to have] been stored there for quite some time[,] . . .[f]urniture was piled on top of other furniture.  There were newspapers, magazines, boxes everywhere." (Paper 18, Ex. 6, Zammichieli Dep., at 18-20).  Officer Parker also testified that there were "gallon jugs of what appeared to be urine stacked" in a hallway outside the bathroom on the lower level of the home.  (Paper 18, Ex. 8, Parker Dep., at 8).

Plaintiff denies that there were ever buckets of urine in his home.[3] (Paper 24, Ex. 1, Pence Aff., ¶ K).

After approximately an hour at the site, Defendant Zammichieli consulted with Mr. Stewart and they agreed that Plaintiff met the criteria for an emergency evaluation petition, which may be filed if a person appears (1) to have a mental illness, and (2) to be an imminent danger to himself or someone else. (Paper 18, Ex. 6, Zammichieli Dep., at 27); Md. Code Ann., Health-Gen. § 10-622(a). Defendant Zammichieli filled out the petition, attached as Exhibit 7 to Defendants' motion for summary judgment.

The police asked Plaintiff whether he would go to the hospital voluntarily. He refused, at which point they handcuffed him and transported him to Washington Adventist Hospital in Takoma Park, Maryland. Defendant Zammichieli orally explained to the charge nurse what was in the petition for emergency evaluation, and she and Mr. Stewart then left. (Paper 18, Ex. 6, Zammichieli Dep., at 31).

At the hospital, Plaintiff met with two doctors, including Dr. James K. Lightfoot. (Paper 18, Ex. 10, Lightfoot Aff., at ¶¶ 7-9). The decision to commit an individual who is brought in on an emergency evaluation petition is made by two medical doctors, each of whom certifies independently that he has met with the individual

---

[3] Plaintiff does not specifically deny that there were buckets of liquid stored in the bathroom, which Defendants reasonably could have believed were filled with urine.

and arrived at the decision that he is a danger to himself or others and should be involuntarily committed. (*Id*. at ¶ 7).  Dr. Lightfoot stated that when deciding whether a person should be involuntarily committed pursuant to an emergency evaluation petition, hospital physicians meet and talk with the person, perform a physical examination, perform laboratory work, and review and consider the petition.  (*Id*. at ¶¶ 5-6).  The Admitting Note signed by Dr. Dida K. Ganjoo, M.D. recites:

> This is the first psychiatric hospital admission for this 53-year-old white male who was brought into the emergency room on a police ECP.  The patient stated that four days ago, four Black people beat him up and he called the police yesterday.  He was again threatened by people.  He said that he called the police and they did not find any evidence. The police noted when they arrived that the patient had been collecting urine, and there were guns and trash everywhere.  He has been threatening to kill Black people.  The patient was getting paranoid and delusional.   The patient has a history of schizophrenia.   He has been noncompliant with medication.   He does not give much history.

(Paper 18, Ex. 11).  As to mental status, the Note includes: "His mood is depressed and irritable.   He is very suspicious and paranoid and is feeling hopeless.  He is very irritable and easily agitated.  The patient is very angry at times and he is in denial about his illness." (*Id*.).

Plaintiff remained in the custody of the hospital involuntarily for six days and was diagnosed with

schizophrenia/paranoid type.  (Paper 18, Ex. 10, Lightfoot Aff., at ¶¶ 10-11).

On October 23, after Plaintiff had been transported to the hospital, Officer Parker and Officer Mark Monaghan removed six guns from Plaintiff's house, took them to the police station and entered them into evidence.  (Paper 18, Ex. 8, Parker Dep., at 20-21; *id.*, Ex. 9).  In addition to the firearms, the officers also removed ammunition, ammunition magazines, a ballistics vest, and a backpack from Plaintiff's home.  (Paper 18, Ex. 9).  Plaintiff testified that when he returned home from the hospital, other items were missing, including a gold coin collection and various hand tools. (Paper 18, Ex. 1, Pence Dep., at 121-122).

On November 27, 2001, Plaintiff filed an application for the return of his firearms.  (Paper 18, Ex. 12).  Defendant Lieutenant Robert Bolesta was in charge of investigating Plaintiff's application for the return of his firearms.  (Paper 18, Ex. 13, Bolesta Dep., at 14-15).  The application asked whether Plaintiff had ever been confined to a mental health facility.  Plaintiff responded affirmatively, writing that he had been hospitalized at Adventist Hospital in Takoma Park, Maryland from October 23-October 29, 2001, listing the diagnosis as "acute sleep deprivation." (*Id.*).  While processing the application, Defendant Bolesta asked Sergeant Al Williams to do motor vehicle and criminal background checks on Plaintiff, which indicated that Plaintiff had no

"significant criminal or traffic background." (Paper 18, Ex. 13, Bolesta Dep., at 24).

Because of the circumstances surrounding the seizure of Plaintiff's weapons, Defendant Zifcak asked Defendant Bolesta "to read the rest of the reports to date." (*Id.* at 14). Defendant Bolesta read the officers' reports, the petition for emergency evaluation, and spoke with Officer Chuckerel. Based on the information he learned from these sources, Defendant Bolesta denied Plaintiff's request for the return of his firearms on March 7, 2002, because Plaintiff's "[m]ental health is unstable and [he] poses a threat to the community." (Paper 18, Ex. 14). The "return of firearms denial notice," which Plaintiff admits he received and read, stated that the firearms would be destroyed after 60 days from the date of the notice, March 7, 2002. (*Id.; id.*, ex. 1, Pence Dep., at 139).

Defendant Bolesta testified that he personally spoke with Plaintiff after he made the decision to deny the return of his firearms, and that he told him to contact the field services bureau lieutenant for an appeal process. (Paper 18, Ex. 13, Bolesta Dep., at 20). Defendant Bolesta recalled Plaintiff indicating that he was planning on getting an attorney, to which Bolesta responded encouragingly. (*Id.*). Plaintiff wrote in his affidavit that "Lt. Bolesta never called me on the 21st of December 2001, or on any other date, to state that he was going to deny my application for

the return of my firearms or to explain the process of appeal or that there even was a process of appeal." (Paper 24, Ex. 1, Pence Aff., ¶ M). Plaintiff does not specifically deny, however, that he *spoke with* Defendant Bolesta, regardless of who initiated the call, and that he was advised that a process of appeal existed. In fact, Plaintiff agreed that Defendant Bolesta recommended he speak with an attorney. (Paper 18, Ex. 1, Pence Dep., at 142). It is undisputed that Plaintiff took no further action regarding his firearms until the following August. On August 13, 2002, Plaintiff's counsel wrote a letter to the police requesting the return of Plaintiff's firearms, coins, hand tools, ammunition, ballistics vest, and all other items he claims were taken from his home in October 2001. (Paper 18, Ex. 15). Defendants admit that the seized firearms have been destroyed. (Paper 5).

## II. Procedural Background

Plaintiff, proceeding *pro se*, filed an action in this court on October 20, 2004, bringing claims under the United States Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1985(3); various provisions of the Maryland Declaration of Rights; and the Maryland Local Government Tort Claims Act ("LGTCA"), Md. Code Ann., Cts. & Jud. Proc. § 5-301 *et seq.*, under which he brought state tort claims for replevin, involuntary imprisonment, improper detention, improper dentinue, taking and seizing of property, trover, and conversion.

In response, Defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), arguing that: (1) the federal constitutional claims under § 1983 and § 1985(3) should be dismissed because Plaintiff already sued Defendants in their official capacities on similar claims in the Circuit Court for Montgomery County, and that court dismissed his claims with prejudice; (2) Plaintiff failed to state a cause of action for individual liability under 42 U.S.C. § 1985(3); (3) Plaintiff failed to state a claim under the Maryland Declaration of Rights, Articles 2, 5, 19, 20, 23, 24, 26, and 45; and (4) Plaintiff should not be allowed to pursue piecemeal litigation.   In an Order issued September 21, 2005, this court dismissed all direct federal constitutional claims; the official capacity claims under § 1983; the official and individual capacity claims under § 1985(3); and the claims based on the Declaration of Rights, Articles 2, 5, 19, 20, 23, and 45.   (Paper 12).

The other claims, specifically those against Defendants in their individual capacities under § 1983; those under Articles 24 and 26 of the Maryland Declaration of Rights; and the state tort claims brought under the LGTCA, were allowed to proceed, and those are the claims at issue in the instant motion for summary judgment.

**III. Standard of Review**

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an

affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## IV. Section 1983 Claims

Plaintiff seeks recourse against Defendants under 42 U.S.C. § 1983 for the alleged violation of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the federal constitution.[4]  Plaintiff specifically contends that Defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures by having him involuntarily committed to the hospital and seizing his personal property.  (Paper 1, ¶¶ 10-16). Plaintiff further alleges that Defendants violated his Fourteenth Amendment right to due process by seizing him and retaining his property without proper notice or opportunity to be heard.  *Id.*

---

[4] Plaintiff asserts that he was deprived of his Fifth Amendment right to due process.  The Due Process Clause of the Fifth Amendment applies only to the conduct of federal actors. *Winfield v. Bass*, 106 F.3d 525, 530 n. 2 (4th Cir. 1997).

Defendants argue that they did not violate Plaintiff's constitutional rights and, even assuming there were violations, that they are entitled to qualified immunity.

The court need not engage in a due process analysis with regard to Plaintiff's involuntary commitment because the Fourth Amendment applies. *See Graham v. Connor*, 490 U.S. 386 (1989). The Supreme Court held that because the Fourth Amendment provides an explicit textual source of constitutional protection against unreasonable searches and seizures, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide" for analyzing conduct that could potentially fall under either category. *Graham*, 490 U.S. at 395; *Presley v. City of Charlottesville*, 464 F.3d 480, 491 (4th Cir. 2006). All of Plaintiff's claims related to his transportation to, and involuntary commitment at, the hospital fall within the ambit of the Fourth Amendment Seizure Clause. Thus, that provision, "not the more generalized notion of 'substantive due process,' must be the guide for analyzing [Plaintiff's] claims." *Graham*, 490 U.S. at 395.

Therefore, the questions presented are whether Defendants violated Plaintiff's Fourth Amendment rights by (1) transporting Plaintiff to the hospital against his will; (2) involuntarily committing him to the hospital for a period of six days; and (3)

whether Defendants violated Plaintiff's Fourteenth Amendment rights by refusing to return his property.

## A.  Transportation to Hospital

Plaintiff alleges that "the police officers" unlawfully seized him and transported him to the hospital in violation of his Fourth Amendment rights.   The Fourth Amendment, in pertinent part, provides individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  The general right to be free from seizure unless probable cause exists is clearly established in the mental health seizure context.  *Gooden v. Howard County, Md.*, 954 F.2d 960, 968 (4th Cir. 1992).  *See also S.P. v. City of Takoma Park*, *Md.*, 134 F.3d 260, 266 (4th Cir. 1998) (holding that police officers "must have probable cause to believe that the individual posed a danger to [him]self or others before involuntarily detaining the individual").

Defendant Zammichieli signed the petition for Plaintiff's emergency evaluation (paper 18, Ex. 7), thus authorizing the unnamed police officers to transport Plaintiff to the hospital. She relied, to some extent, on information provided by Defendant Zifcak.[5]   As will be discussed, both of these defendants had reasonable grounds for believing that further investigation was

_____

[5] Defendant Bolesta was not present at Plaintiff's residence at the time he was transported and had no involvement in that stage of the events.

16

appropriate.   Before addressing that issue, however, Plaintiff's complaint that he was never personally interviewed by Defendant Zammichieli, so she was not authorized under Maryland law to prepare the petition for emergency evaluation, should be addressed. Maryland law provides in Md. Code Ann., Health-Gen., § 10-622:

> (b)(1) The petition for emergency evaluation of an individual may be made by:
> (i) A physician, a psychologist, a clinical social worker, a licensed clinical professional counselor, clinical nurse specialist in psychiatric and mental health nursing, psychiatric nurse practitioner, or a health officer or designee of a health officer who has examined the individual;
> (ii) A peace officer who personally has observed the individual or the individual's behavior; or
> (iii) Any other interested person.
> (2) An individual who makes a petition for emergency evaluation under paragraph (1)(i) or (ii) of this subsection may base the petition on:
> (i) The examination or observation; or
> (ii) Other information obtained that is pertinent to the factors giving rise to the petition.

The evidence of Defendant Zammichieli's presence and ability to observe Plaintiff on October 23 is, in essence, uncontroverted.[6] Plaintiff states that she never interviewed him, but does not state that she was not present.   Even if she were not present, however, a violation of state law, in the absence of a violation of the Constitution or laws of the United States, is not actionable under

---

[6] (*See* Paper 24, Ex. 7, Zammichieli Dep., at 18; *id.*, Ex. 8, Parker Dep., at 11; Paper 27, Ex. 17, Stewart Aff. ¶¶ 3, 6, 7; *id.*, Ex. 2, Chuckerel Dep., at 20).

§ 1983. *Clark v. Link*, 855 F.2d 156, 161-63 (4th Cir. 1988). Moreover, Maryland law apparently does not always and unalterably require a personal interview. In *Ransom v. Baltimore County*, Judge Legg granted qualified immunity to a police officer who signed a petition for the plaintiff's emergency evaluation without personally interviewing him as required by statute. 111 F.Supp.2d 704 (D.Md. 2000). In *Ransom*, a police officer's wife went to his precinct and reported concerns over his recent erratic behavior, including pointing a gun at himself and at her. *Ransom*, 111 F.Supp.2d at 707. The wife was interviewed by the supervisor on duty, the captain, a detective, and a doctor from the local hospital. Based on his interview with the wife, the detective prepared a petition for emergency evaluation. This court found that the fact that the officer who prepared the report had not personally observed the plaintiff's behavior, as required by statute, did not bar the defense of qualified immunity.

> [Plaintiff] Officer Ransom also charges that Defendants [Captain] Vaughan and [Detective] Bonsall did not observe him personally prior to completing the Petition for Emergency Evaluation, as required by Md. Code Ann. Health-Gen I. § 10-622(a) and police procedure. (*See* Bonsall Dep. at 52.). . . Under ideal circumstances, the officers would likely have personally observed Officer Ransom prior to petitioning for his confinement. Qualified immunity, however, protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and protects officers from "bad guesses in gray areas." *Wilson v. Layne*, 141

18

> F.3d 111, 114 (4th Cir. 1998). Even if the
> Baltimore County police made a bad guess in
> this case, and the Court is not persuaded that
> they did, they are protected by qualified
> immunity.

*Ransom*, 111 F.Supp.2d at 709-10.  *See also Chathas v. Smith*, 884

F.2d 980, 987 (7th Cir. 1989) (finding officers' detention of

individual reasonable when effectuated based upon information

provided by doctor, rather than their own personal observations).

An evaluation of the evidence available to Defendants Zifcak

and Zammichieli, even if some of the information was in some sense

incorrect, led them reasonably to believe that further

investigation was appropriate.

Probable cause is a "practical, nontechnical conception" that

addresses "the factual and practical considerations of everyday

life on which reasonable and prudent men, not legal technicians,

act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quotation marks

omitted).  It is a "fluid concept" that cannot be "reduced to a

neat set of legal rules." *Id.* at 232.  The United States Court of

Appeals for the Fourth Circuit has held that in the case of the law

governing seizures for psychological evaluations, there is a "lack

of clarity" as far as what constitutes probable cause. *Gooden*, 954

F.2d at 968.

Plaintiff avers that Defendant Zammichieli relied on

information supplied to her by Defendant Zifcak in preparing the

petition. (Paper 24, ¶¶ H, J, K).  In order for Plaintiff to

19

succeed on a Fourth Amendment claim against Defendant Zifcak, Plaintiff would have to prove that Zifcak "deliberately, or with a reckless disregard for the truth made material false statements" to Defendant Zammichieli, and that those false statements supplied the probable cause for the emergency petition. *See Miller v. Prince George's County, Md.*, No. 05-2250 (4th Cir. decided Jan. 22, 2007); *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).

According to Defendant Zammichieli, Defendant Zifcak told her:

> That he was concerned about Mr. Pence. That [Plaintiff] had a number of loaded guns in his house. . . . That he had seen what he thought were self-inflicted wounds on Mr. Pence's hands. That he also stated that Mr. Pence had a belief that someone had assaulted him and that his story kept changing. And that he didn't have any evidence for the actual assault.

(Paper 18, Ex. 6, Zammichieli Dep., at 5). Plaintiff may disagree with some of Defendant Zifcak's conclusions, but there is no evidence that he knowingly or recklessly made false statements. Defendant Zifcak consulted the original investigators to ascertain whether there was any complaint of a physical injury originally and spoke to a doctor whose name and number were provided by Plaintiff. Thus, Plaintiff has not presented evidence sufficient to pursue a Fourth Amendment claim against Defendant Zifcak.

Moreover, Defendant Zammichieli had no reason to suspect that Defendant Zifcak was supplying her with false information. Additionally, Defendant Zammichieli personally observed (or through

other officers learned of) the "deplorable" living conditions in Plaintiff's home, the numerous firearms stored throughout the house, and the stored buckets of urine.[7] (Paper 18, Ex. 6, Zammichieli Dep., at 18-20).  Significantly, Plaintiff informed those at his home on October 23 that he had been prescribed medications for schizophrenia that he had not been taking.

Defendant Zammichieli reasonably relied on the information supplied to her by Defendant Zifcak - the numerous loaded guns, apparently self-inflicted wounds, and Plaintiff's conflicting accounts of an alleged assault.  This information combined with Defendant Zammichieli's own personal observations (or observations of the other police officers who undeniably visited Plaintiff's home on October 23), gave rise to probable cause to believe that Plaintiff posed a danger to himself or others, and she was justified in directing the police officers to transport him to the hospital, via the emergency evaluation petition.

Because Defendant Zammichieli had probable cause to fill out the petition for emergency evaluation, thus authorizing Plaintiff's transportation to the hospital, Defendants are entitled to judgment on this portion of Plaintiff's Fourth Amendment claim.

---

[7] Although Plaintiff denies that there were buckets of urine, (paper 24, Ex. 1, Pence Aff., ¶ K) he does not deny that there were buckets filled with liquid, which Defendant Zammichieli and Officer Parker (paper 18, Ex. 8, Parker Dep., at 8) could reasonably have mistaken for urine.

### B.  Involuntary Commitment

Plaintiff claims that Defendants unlawfully seized him by having him involuntarily committed for six days.  Defendants argue that any Fourth Amendment claim arising from Plaintiff's involuntary commitment fails as a matter of law because none of the named Defendants had the authority to commit Plaintiff to the hospital.  Plaintiff admits that it was the attending emergency room physicians who authorized his involuntary commitment.  (Paper 1, ¶ 24).  However, he contends that Defendants "defacto committ[ed]" him because they supplied information to the physicians that provided the basis for their determinations that he should be involuntarily committed.  (Paper 1, ¶ G).  Plaintiff essentially alleges that the commitment was unreasonable because it followed from a petition that was deficient because it was dishonest.

To succeed on his claim, Plaintiff must prove that Defendants "deliberately, or with a reckless disregard for the truth made material false statements" in his petition, and that those false statements supplied the probable cause for the physicians to commit him.  *See Miller*, No. 05-2250, at *7; *Colkley*, 899 F.2d at 300.

Although Defendants contributed to the chain of events leading to Plaintiff's involuntary commitment, they did not, themselves, seize Plaintiff.  The ultimate determination to commit Plaintiff was made by the physicians at the hospital.  Even if some

22

information from Defendants was included in the physicians' probable cause finding, and that information was false, it does not constitute a Fourth Amendment violation unless the information was necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 156 (1978), cited in *Wilkes v. Young*, 28 F.3d 1362, 1365 (4ᵗʰ Cir. 1994).

At the hospital, Plaintiff met with two doctors, including Dr. Lightfoot. (Paper 18, Ex. 10, Lightfoot Aff., at ¶¶ 7-9). Dr. Lightfoot met and talked with Plaintiff, performed a physical exam and laboratory work, and reviewed and considered the petition for emergency evaluation. (*Id.* at ¶¶ 5-7). Based on all this information, he and another doctor independently determined that Plaintiff posed a danger to himself or others and should be involuntarily committed. (*Id.* at ¶ 11). In the Admitting Note, Dr. Ganjoo wrote:

> The patient stated that four days ago, four Black people beat him up and he called the police yesterday. He was again threatened by people. He said that he called the police and they did not find any evidence. The police noted when they arrived that the patient had been collecting urine, and there were guns and trash everywhere. He has been threatening to kill Black people. The patient was getting paranoid and delusional. The patient has a history of schizophrenia. He has been noncompliant with medication. He does not give much history.

(Paper 24, Ex. 11). The only information in this note that is directly attributable to Defendants is: "The police noted when they

arrived that the patient had been collecting urine, and there were guns and trash everywhere." (*Id.*). Even if this piece of information was false, it was not necessary to the finding of probable cause. *See Wilkes*, 28 F.3d at 1365. The doctors observed Plaintiff making deadly threats, observed him to be "paranoid and delusional," and learned that he had a history of mental illness and was not taking his medication. (Paper 24, Ex. 11). Based on the record, the emergency room physicians made the determination that Plaintiff should be involuntarily committed, and could have done so even without the information supplied to them by Defendants. Thus, Defendants are not liable for any possible Fourth Amendment violation resulting from Plaintiff's involuntary commitment.

## C. Seized Property

Plaintiff cannot maintain a Fourth Amendment claim arising from the seizure of his property because it is undisputed that Officer Parker, who is not a defendant in this lawsuit, seized the guns from Plaintiff's residence. (Paper 18, Ex. 8, Parker Dep., at 20-21).[8] Plaintiff also claims that Defendants unlawfully deprived

---

[8] Plaintiff further alleges that "unknown, unnamed individual Montgomery County Police Officers" unlawfully seized valuable gold coins from his residence while he was being held against his will at the hospital. (Paper 1, ¶¶ 26-27; paper 18, Ex. 1, Pence Dep., at 117). As stated above in footnote one, all claims against unidentified Montgomery County police officers will be dismissed. Plaintiff has not proffered any evidence linking the named Defendants to the alleged theft of his gold coins, thus the court
(continued...)

him of his property without due process of law when they subsequently denied his requests for the return of his property and later destroyed it.

The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner (usually prior to the deprivation of a protected interest)[.]" *Bogart v. Chapell*, 396 F.3d 548, 556 (4th Cir. 2005) (parentheses in original, internal quotation marks omitted).  To state a claim for violation of procedural due process rights, Plaintiff must show (1) that he has a property interest in his firearms and related items; (2) that Defendants deprived him of that interest; and (3) that they did so without due process of law.  *See Sunrise Corp. v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005).

Procedural due process, insofar as deprivation of property is concerned, requires notice of the proposed official action and a reasonable opportunity to contest it.  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).  This means an opportunity to be heard "at a meaningful time and in a meaningful manner."  *Armstrong v. Mango*, 380 U.S. 545, 552 (1965).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

---

[8](...continued)
will grant summary judgment to Defendants on all § 1983 claims related to Plaintiff's gold coins.

The actions Plaintiff contends unlawfully deprived him of his property were: the refusal to return his firearms and the subsequent destruction of those firearms. Thus, Plaintiff argues, Defendants were required to provide him adequate notice of these actions and a reasonable opportunity to contest them.

"The amount of notice due depends on the context." *Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 253 (4th Cir. 2005) (quoting *Reynolds v. Wagner*, 128 F.3d 166, 179 (3d Cir. 1997)). Plaintiff received adequate notice of both the decision to deny the return of his firearms and of Defendants' intent to destroy those firearms. He admits that he received and read the "return of firearms denial notice" issued to him by Defendants on March 7, 2002. (Paper 18, Ex. 1, Pence Dep., at 139; *id.*, Ex. 14). The notice stated, in bold type, that Plaintiff's application for the return of his firearms had been denied and that his firearms would be destroyed after 60 days from that date. (Paper 18, Ex. 14). This was sufficient to put Plaintiff on notice of the proposed official actions.

The court must next consider whether Plaintiff had a reasonable opportunity to contest these actions. Defendant Bolesta testified that he spoke with Plaintiff over the phone and informed him of an appeal process.[9] (Paper 18, Ex. 13, Bolesta Dep., at

_____

[9] Plaintiff disputes that Defendant Bolesta initiated the telephone call, but does not specifically deny that Defendant (continued...)

26

20).  Plaintiff admits that he spoke with Defendant Bolesta who recommended he consult a lawyer, which he later did.  (Paper 18, Ex. 1, Pence Dep., at 142).

It is unclear from the record what appeal process Defendant Bolesta advised Plaintiff to pursue.  The Supreme Court, however, has stated that "[o]nce the property owner is informed that his property has been seized, he can turn to . . . public sources to learn about the remedial procedures available to him.  The City need not take other steps to inform him of his options." *City of West Covina v. Perkins*, 525 U.S. 234, 241 (1999).

There were state remedies available to Plaintiff.  "[T]o determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state." *Tri County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002).  "If the plaintiff has lost something that fits into one of the three protected categories of life, liberty, or property, then the question that must be answered is whether the plaintiff received the minimum measure of procedural protection warranted under the circumstances." *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 266 (4th Cir. 2005) (internal citations and alterations omitted).

---

[9](...continued)
Bolesta informed him of an appeal process.  (Paper 24, Ex. 1, Pence Aff., ¶ M).

The Maryland Code Annotated provisions governing firearms (including handguns, rifles, and shotguns) contain a process for hearings and appeal.  *See* Md. Code Ann., Pub. Safety § 5-101, *et seq.* (Art. 27, § 441, *et seq.*).[10]  For example, a person may appeal an adverse decision on an application for a transfer of firearms. The statute provides that "[a] firearm applicant who is aggrieved by the action of the Secretary may request a hearing by writing to the Secretary within 30 days after the Secretary forwards notice to the firearm applicant under § 5-122 [Art. 27, § 442] of this subtitle. . . . The Secretary shall grant the hearing within 15 days after receiving the request."  Md. Code Ann., Pub. Safety § 5-126 (Art. 27, § 442).  "Secretary" means "the Secretary of State Police or the Secretary's designee."  Md. Code Ann., Pub. Safety § 5-101 (Art. 27, § 441 *et seq.*).  Defendant Bolesta functioned as the Secretary's designee in this case.  The statute further provides that the hearing shall be held in accordance with the Maryland Administrative Procedures Act, codified in Title 10,

---

[10]Pursuant to Chapter 5, Acts 2003, effective October 1, 2003, the "Regulated Firearms" subheading, Md. Code (1957, 1996 Repl.Vol., 2002 Supp.) Art. 27 § 441 *et seq.*, was repealed and re-enacted as Maryland Code (2003), §§ 5-101 *et seq.* of the Public Safety Article, without substantial change.  The purpose of the revision was to state "the law in a clear, concise, and organized manner, without changing the effect of the law."  Md. Code Ann., Pub. Safety, Refs & Annos.  The events took place prior to the repeal and re-enactment of the subheading.  Because the subheading was edited for clarity only, the court will quote from, and cite to, the current code, followed by citations to the former Articles.

Subtitle 2 of the State Government Article.  Thus, Plaintiff had the opportunity for a hearing under § 5-126, formerly Art. 27, § 442.  Had Plaintiff written to Defendants within 30 days of receiving the denial notice, they would have been obligated to grant him a hearing.  Plaintiff, however, did not write to Defendants again until August 13, much longer than 30 days later.

Alternatively, Defendants argue, (paper 18, at 25), that Plaintiff's guns were seized pursuant to Criminal Law Article § 4-206(a)(1)(ii), (formerly Art. 27, § 36D):

> (a)(1) A law enforcement officer may make an inquiry and conduct a limited search of a person under paragraph (2) of this subsection if the officer, in light of the officer's observations, information, and experience, reasonably believes that: (i) the person may be wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle; (ii) because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others; (iii) under the circumstances, it is impracticable to obtain a search warrant; and (iv) to protect the officer or others, swift measures are necessary to discover whether the person is wearing, carrying, or transporting a handgun.

This subtitle allows an officer to seize a handgun if the person does not produce evidence that he is authorized to wear, carry, or transport a handgun.  Md. Code Ann., Crim. Law § 4-206(b) (Art. 27, § 36D).  The statute specifically states that "nothing in this section shall be construed to limit the right of any law-enforcement officer to make any other type of search, seizure,

and arrest which may be permitted by law." Md. Code Ann., Crim. Law § 4-206(e) (Art. 27, § 36D(c)). It is unlikely that this statute is directly applicable here.[11]

Even if § 4-206 (formerly Art. 27, § 36D) was the law upon which Defendants erroneously relied when they seized Plaintiff's firearms, and the legality of the original seizure is not at issue here because Plaintiff has not named as a defendant the seizing officer, Plaintiff had adequate process under *this* Article to contest the subsequent denial of his application for the return of his firearms. From the text of § 4-206 (formerly Art. 27, § 36D), when a handgun is seized pursuant to § 4-206, it is because the police officer believed that person was violating § 4-203 (formerly Art. 27, § 36B), therefore, the post-seizure remedies that apply to § 4-203 also apply to § 4-206.

The Criminal Procedures Article provides:

> On timely receipt of an application, the seizing authority shall hold an informal review to determine whether the owner knew or should have known of the use or intended use of a handgun that is seized in violation of § 4-203 or § 4-204 of the Criminal Law Article. (2) The review is not subject to the Administrative Procedure Act.
> . . .

---

[11]   As Plaintiff points out, the majority of firearms seized from his residence were rifles and shotguns and this subtitle pertains exclusively to handguns. (Paper 24, at 9). Furthermore, it is not clear from the record that Plaintiff was wearing, carrying, or transporting a handgun prior to the seizure of his firearms.

(c)(1) After review, if the seizing authority
determines that the handgun should be
forfeited to the State, the owner shall be
notified at the owner's last known address.
(2) Within 30 days after notification, the
owner may ask the appropriate District Court
for release of the handgun.
(3) The State's Attorney shall represent the
State in the action.
(4) The District Court shall hear the matter
and grant proper relief in accordance with
this subtitle.

Md. Code Ann., Crim. Proc. § 13-204 (Art. 27 § 36C).

Both the civil and the criminal statutes provide a 30 day
period during which Plaintiff could have appealed Defendant
Bolesta's decision to deny the return of his firearms and to
challenge their proposed destruction.  Even if Plaintiff did not
take advantage of the opportunities for a hearing afforded him
under the different subtitles, he was given due process.  *See Betty
B Coal Co. v. Director, Office of Workers' Comp. Programs, United
States Dep't. of Labor*, 194 F.3d 491, 503 (4th Cir. 1999) (finding
no due process violation when petitioner failed to take advantage
of opportunity to be heard, "[t]he due process right to be heard
compels the government to listen, but not the defendant to
speak.").

Furthermore, even if his due process rights were not followed,
Plaintiff filed suit in state court and succeeded on his claim
against Montgomery County that the seizure and destruction of his
firearms violated the Maryland Declaration of Rights.  In that

action, he was awarded $5,640. (Paper 24, Ex. 9). Thus, any claim for compensatory damages is moot.

## V.   Maryland Declaration of Rights, Arts. 24 & 26

Plaintiff alleges violations of his state constitutional rights under Article 24 and Article 26.[12] Article 24 protects due process rights and Article 26 protects the right to be free from unreasonable searches and seizures; the statutes are construed *in pari materia* with the Fourteenth and Fourth Amendments of the United States Constitution, respectively. *See Canaj, Inc. v. Baker and Div. Phase III*, 391 Md. 374, 424 (2006); *see also Carter v. State*, 367 Md. 447, 458 (2002).

### A. Involuntary Commitment

Defendants argue that Plaintiff's claims regarding his involuntary commitment cannot be maintained under either article, because he failed to give the requisite timely notice under the LGTCA. (Paper 18, at 30). The LGTCA requires that, in actions against a local government or its employees, notice be given within

---

[12]   Md. Const. art. XXIV: That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Md Const. art. XXVI: That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

180 days of the injury.   Md. Code Ann., Cts. & Jud. Proc. § 5-304(a) (1999), *amended by* 2006 Md. Laws 186.   The notice provision of the LGTCA applies to state constitutional claims.   *Carter v. Jess*, 179 F.Supp.2d 534, 541 (D.Md. 2001).

Plaintiff counters that Defendants had constructive notice of the claims because of the extensive litigation in state court, and furthermore, Defendants must show prejudice from the lack of notice.   (Paper 24, at 19) (citing Md. Code Ann., Cts. & Jud. Proc. § 5-304(c)).[13]

Plaintiff's argument that Defendants had "constructive notice" of his claim for involuntary commitment is analogous to the concept of "substantial compliance."

> Under certain circumstances, . . . "a litigant is excused from strict compliance with the notice obligation, so long as 'the purpose of the notice statute was fulfilled by substantial compliance with the statutory requirements.'" *White v. Prince George's County*, 163 Md.App. 129, 144, 877 A.2d 1129 (2005), *cert. denied*, 389 Md. 401, 885 A.2d 825 (2005) (citation omitted). "Substantial compliance 'requires some effort to provide the requisite notice and, in fact, it must be provided, albeit not in strict compliance with the statutory provision.'" *Id.* at 145, 877 A.2d 1129 (citation omitted). "However, when the notice does not apprise the proper officials that the Plaintiff is pursuing a claim, there is not substantial compliance."

---

[13] Section 5-304(c) provides that "unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given."

>*Bibum v. Prince George's County*, 85 F.Supp.2d
>557, 564 (D.Md. 2000).

*Wilbon v. Hunsicker*, --- A.2d ----, 2006 WL 3821398, at *3 (Md.Ct.Spec.App. Dec. 29, 2006).

The purpose of the notice requirement is "to protect the municipalities and counties of the State from meretricious claimants and exaggerated claims by providing a mechanism whereby the municipality or county would be apprised of its possible liability at a time when it could conduct its own investigation, *i.e.*, while the evidence was still fresh and the recollection of the witnesses was undiminished by time, 'sufficient to ascertain the character and extent of the injury and its responsibility in connection with it." *Williams v. Maynard*, 359 Md. 379, 389-90 (2000) (quoting *Bartens v. City of Baltimore*, 293 Md. 620, 626 (1982)). *See also Moore v. Norouzi,* 371 Md. 154, 167-168 (2002). In light of this purpose, the Court of Appeals of Maryland has recognized "substantial compliance" when a plaintiff contacts either the corporate authorities of the local government or its claims representatives. *See Moore*, 371 Md. 154; *Mendelson v. Brown*, 371 Md. 154 (2002); *Faulk v. Ewing*, 371 Md. 284 (2002).

The state court held that Plaintiff substantially complied with the notice requirement by informing Montgomery County of his intent to sue to recover his property through timely correspondence regarding the taking of his firearms. (Paper 27, Ex. 19, Unreported Opinion). There is no evidence that Plaintiff

34

complained of his involuntary commitment to Defendants, their corporate authorities, or claims representatives within the 180 day period.   Therefore, he has not complied, substantially or otherwise, with the LGTCA notice requirement regarding his involuntary commitment.

Plaintiff points out that Defendants have not shown prejudice from lack of notice.   (Paper 24, at 20).   While that may be true, it is Plaintiff's initial burden to show good cause for why the notice requirement should be waived.   The question of whether there is good cause to waive the notice requirement is within the discretion of the trial court.   *Heron v. Strader*, 361 Md. 258, 270 (2000); *Downey v. Collins*, 866 F.Supp. 887, 889 n. 7 (D.Md. 1994). Because Plaintiff did not provide timely notice of his claim for involuntary commitment, and has not shown good cause why the notice requirement should be waived, Defendants are entitled to summary judgment on the state constitutional claims related to Plaintiff's involuntary commitment.

**B. Property**

For the same reasons that Plaintiff's procedural due process claim related to Defendants' refusal to return his property fails, so does his parallel claim under Article 24.   "Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution have the same meaning . . .[,]" *Burdick v. Brooks*, 160 Md.App. 519, 524 (Md.Ct.Spec.App. 2004), and

35

therefore, an analysis of a claim under the Fourteenth Amendment applies with equal force to the same claim under Article 24.  *See also Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, *appeal dismissed*, 449 U.S. 807 (1980).  In addition, this claim was previously brought against Montgomery County in state court and a judgment obtained.  He cannot recover the same compensatory damages a second time.

Plaintiff cannot maintain a substantive due process claim because, as in federal law, Maryland follows the principle of statutory construction that "a specific statutory provision governs over a general one."  *See Lumbermen's Mut. Cas. Co. v. Insurance Com'r.*, 302 Md. 248, 268 (1982).  Where one statutory provision specifically addresses a matter, and another more general statutory provision also may cover the same matter, "the specific statutory provision is held to be applicable and the general provision is deemed inapplicable."  *Id.  See also Graham*, 490 U.S. at 395.

As stated earlier, Plaintiff cannot maintain a Fourth Amendment, or, therefore, an Article 26, claim for the seizure of his firearms because he has not named the seizing officer as a defendant in this lawsuit.

Defendants are entitled to summary judgment on all state constitutional claims.

**VI.   State Tort Claims**

    **A.   Personal Torts**

    Plaintiff brings state tort claims against Defendants Zammichieli and Zifcak for involuntary imprisonment and improper detention related to his involuntary commitment.  (Paper 1, ¶ 23).

    As discussed above, Plaintiff failed to provide timely notice of his intent to bring a claim related to his involuntary commitment.  Because Plaintiff seeks unliquidated damages from Defendants, all of whom are employees of a local government, compliance with the notice requirement of the LGTCA is a mandatory condition precedent to the right to maintain an action for damages. *Madore v. Baltimore County, Md.*, 34 Md.App. 340 (Md.Ct.Spec.App. 1976).  Thus, Plaintiff may not bring state tort claims against Defendants for his involuntary commitment.

    **B. Property Torts**

    Plaintiff has brought claims in replevin, and for "detinue, taking and seizing of property, trover, and conversion" in relation to the taking of his firearms and coins.  As a preliminary matter, the court will reiterate that Plaintiff has not alleged how any of the named Defendants were involved with the removal of his gold coins, thus the court will grant summary judgment to Defendants on all tort claims related to the coins.

    Nor has Plaintiff alleged that the named Defendants were responsible for the taking of his firearms.  Rather, he alleges

that Defendant Bolesta's refusal to return his firearms, and Defendant Zifcak's persuasion to that effect, resulted in his tortious loss of property.  As noted before, Plaintiff has already received compensatory damages and cannot obtain double recovery.

Moreover, even if Defendant Bolesta's refusal to return Plaintiff's firearms, or Defendant Zifcak's participation in the decision to deny the firearms, amounted to tortious conduct, they are both protected by statutory immunity.  Government employees in Maryland enjoy limited statutory immunity from liability for what, if non-government employees were involved, would be actionable tortious conduct.  Under § 5-507(b)(1) of the Maryland Code, Courts and Judicial Proceedings Article:

> An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

Police officers, acting in the line of duty, act with discretionary authority.  *See, e.g., Richardson v. McGriff*, 361 Md. 437, 518 (1999) ("we have long recognized that police officers are not subject to traditional tort liability. . . ."). In the present case, Defendants at all relevant times have acted in their discretionary capacities and are thus entitled to statutory immunity.

Statutory immunity may be defeated by a showing of actual malice, *i.e.*, that a defendant acted with ill will, improper

38

motivation, unlawful motive or evil purpose.  *Davis v. Muse*, 51 Md.App. 93, 101 (Md.Ct.Spec.App. 1982).  Plaintiff does not allege any malice on the part of Defendant Bolesta.  Plaintiff asserts, however, that Defendant Zifcak's malice may be inferred from the fact that "[h]e spoke with Ms. Zammichieli, and took the initiative of calling her, he spoke with Lt. Bolesta, and in effect, he had his hand in every aspect of this case. . . ." (Paper 24, at 21).  These bare assertions are insufficient to show malice and Defendants are entitled to summary judgement on all state tort claims related to property.

## VII. Conclusion

The court will grant Defendants' motion for summary judgment on all claims.  A separate Order will follow.

<u>        /s/         </u>
DEBORAH K. CHASANOW
United States District Judge